# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0364-22

J.R.L., [1]

    Plaintiff-Respondent,

v.

P.T.R.,

    Defendant-Appellant.

_____

Submitted October 12, 2023 – Decided December 18, 2023

Before Judges Currier and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FV-03-0548-23.

Kahn & Lehrfeld, LLC, attorneys for appellant (Cori Horowitz Lehrfeld, on the brief).

Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d)(10).

Defendant appeals from a September 26, 2022 final restraining order (FRO), which was entered pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant contends the trial court erred in finding plaintiff proved two predicate acts of domestic violence—harassment and assault. Because the judge's findings were supported by adequate, substantial evidence, including testimony he found credible, we affirm.

After each party obtained a temporary restraining order (TRO) against the other, the court conducted a trial on September 26, 2022. We derive the following facts from the trial.

Plaintiff and defendant dated off and on for over two years. The relationship officially ended over Labor Day weekend in September 2022.

During the relationship, plaintiff lived with defendant and his mother for a few weeks in March 2022. In July 2022, plaintiff moved to an apartment. According to plaintiff, the lease was in defendant's name, but he did not reside there. Plaintiff testified he "may have spent one night, but never more than one night in a row." According to defendant, they lived together in the apartment for one month.

One day that July, defendant went to work with plaintiff at her nannying job. According to plaintiff, "[d]irectly in front of my employer . . . [defendant]

threw my cell phone at me, and was screaming[,] '[Y]ou f[***]ing disgusting whore.' And I was begging him[,] '[P]lease, you know my boss is right here, calm down. She can hear you, you[']r[e] being so loud.'"

According to defendant, plaintiff had left her phone in his car that day. He testified:

> I was upset, because on that day we were—she held up a wedding ring, we were supposed to be getting married on that day knowing she had dating apps on her phone. She was talking to three other guys, and I was upset of course you know. So, I tossed the phone on the grass not far. I said[,] "I need an explanation[.]" I was upset. I walked back to the car. I didn't yell, I didn't scream, I didn't curse. No threats, no—no name calling or insults.

Plaintiff testified she broke off the relationship with defendant on September 1. According to plaintiff, defendant's response was "extreme"; he told her he was going to take away her apartment, phone, and computer.

On September 2, defendant came to the apartment and told plaintiff he was swimming in the building's pool and needed to use the bathroom. He retained a key to the apartment. Plaintiff told defendant she was going to Asbury Park for a few days. When plaintiff returned home on September 4, she "immediately noticed [her] computer [was] missing, and . . . [her] bedroom had been gone through." She stated: "[T]here were drawers open. I noticed some

of my jewelry missing."  Defendant was the only person who had a key to the apartment.

When plaintiff called defendant that day asking about the missing computer, defendant called her "a f[***]ing worthless whore."  Plaintiff testified that defendant "was in a fit of rage.  He was screaming . . . and cursing at me. He was upset that I had just gone to Asbury with another man."  After she hung up the phone, defendant texted her asking, "[D]o you want your computer back or not?"  She replied, "[N]o, just leave me alone."

A half hour later, defendant came to plaintiff's apartment.  After defendant let himself into the apartment, plaintiff stated she ran into her bedroom to hide from him.  Then he let himself into the bedroom.  Plaintiff stated,

> So, I went to go grab my phone, and he pinned me down
> . . . .
>
>     . . . .
>
>     . . . He pushed me down to the floor, and pinned my arms up against my mattress.
>
>     . . . .
>
>     . . . I had the phone in my hands; he was trying to get it back.

Plaintiff testified the parties struggled over the phone and eventually defendant took it from her and started to leave.  She followed him into the

4

parking lot begging him to return her phone. But defendant got into his car and drove away. Plaintiff denied striking defendant during the incident or making any intentional contact with him other than attempting to retrieve her phone.

Plaintiff had "discomfort or pain" in her wrist following the incident. She testified she has a preexisting diagnosis of post-traumatic stress disorder, and "at the point when [defendant] first came in and chased [her] into [her] bedroom . . . [she] truly was in fear for [her] life."

Defendant denied yelling at plaintiff when he came to the apartment on September 4. He stated he did not pin her on the floor or touch her at all. He said if she injured her wrist, it was because she was scratching and hitting him. Defendant produced photographs of bruising and scratches on his arms, shoulders, and chest. Defendant admitted taking the phone with him because he had paid for it. He stated plaintiff had an old phone she could use.

According to plaintiff, when she came into the apartment on September 16 or 17, she saw her "[television] modem was gone," "there were signs . . . taped up to each of the walls of [her] apartment," and "some of [her] jewelry was gone." Plaintiff testified she also found a letter left by defendant for her.

The letter is titled "A Requiem of Love Unrequited." The following are excerpts:

A-0364-22

You needed a phone, so I got you a phone. I was very clear about the terms, yet you violated the contract. You put dating apps on my phone that I bought for you. . . . [Y]ou know it's f[***]ed up to text others on my phone. But you selfishly . . . did it anyway. What if I took the $100 you gave me and spent it on a girl in Asbury [P]ark? What if you bought me a bed with one contingency not to sleep with others; then I spent [two] nights with [someone else]? Answer the tough questions for once.

. . . .

. . . [I]['] m not toxic. [M]y only toxic relationship is with you. [L]ook at the people you surround yourself with. [T]he reason [I] asked you to remove all the toxic people was for your benefit, not mine. [L]indsay is not a real friend. . . . [S]he is toxic.

. . . .

. . . You can [V]enmo me the money for the phone and computer. If you don't pay by Friday, I'll return it to the store. I have the rec[eipts]. It's legally my property, I paid for it.

I hope you remember that the apartment, phone, computer, etc[.] was contingent on the contract. I did so much for you, and asked so little in return. You made a deal with me and the universe. The universe changed, but you didn't. You betrayed us both. You violated every ten[e]t of the contract.

On Tuesday I told you I could help with rent IF every night is a cuddle night. You rejected my offer. You don't want my support? Ok, no more support. If you fail to pay rent, I will have no choice but to

6

terminate the lease. My name is on the lease and I can not let you hurt me anymore.

 . . . .

 You scratched me up pretty good. I documented the injuries. I don't want to have to press charges for assault, file a restraining order, [and] terminate the lease. Please don't do anything drastic you will regret. This is your mess. Clean it up before it's too late[.]

 . . . .

 . . . That [expletive person] in Asbury [P]ark isn't your new [boyfriend], he's just your next victim. If he knew your secrets, if he knew the real you, he would never talk to you again. Why even bother dating? Until your issues are resolved; your trust issues, abandonment issues, drug addiction, eating disorder, sleeping disorder, body dysmorphia, etc.[,] until your issues are resolved[,] you are not wifey material, you are a time bomb. A good girl is faithful. A good girl is loyal. A good girl is honest. A good girl is capable of gratitude.

 . . . Without me you would be homeless. You came to me crying[,] begging for help as a homeless drug addict. You were desperate enough to surrender your self-respect and work as an escort. That was your life without me. So I buil[t] you a new life, again. Ungrateful. . . . I see what you have become. No house, an escort, and an addict. You are a homeless junkie whore.

 . . . .

7

If you live long enough one day you will wake up and realize I am your biggest regret. . . . You will never find anyone better than me. . . .

I told you about my nightmare/premonition. I was the only one at your funeral. Nobody else showed up. . . . I don't think the premonition will come true. Your funeral attendance won[']t be that high.

. . . .

[O]n August 1st [I] asked for [ten] months. [Y]ou didn't even give me [one] month. I offered to marry you. If you loved me back[,] I could be taking you to the dentist with my benefits right now.

. . . .

The worst is your consistently self-destructive choices. You had a choice, forgive me or hate me. You choose hate. You choose the stalker over me. [Y]ou choose the drugs over me. [Y]ou choose sneaking with the [T]rump cultist to a [P]hish concert over me. [Y]ou choose Asbury [P]ark over me.

. . . .

You may contact me only to pay your debts, or to try and make things right with actions. Besides that, I don't want to hear from you. I don't want to see your face. I don't want to hear your voice. Any bullsh[**] and you are blocked with a restraining order. I never want to see you again. You left me without saying goodbye.

8

Two days later, plaintiff found a second letter from defendant in a backpack, titled "Forgiveness [and] Reconciliation." The following are excerpts:

> [Y]ou claim you love me, need me, can[']t live without me. [I] need you to act like it 24/7. [N]o more [three]-[five] days of radio silence. [Y]ou will contact me in the morning, afternoon (lunch break) and after work daily. [W]e will text frequently, just like literally all the other couples out there. . . .
>
> . . . .
>
> I've been asking for pure loyalty and devotion, [I] will no longer tolerate anything less[.]
>
> Step [one]: the list. . . . I know you are co-dependent and never single. But you need time alone to grow. Until you improve your trust issues, abandonment issues, anger issues, drug issues, etc[.], you are not yet wifey material, you are just a time bomb.
>
> Step [two]: block and delete everyone male except me. . . . [D]elete isn't enough. [B]lock [and] delete them all.

Defendant testified he was "heartbroken" when he wrote the letters, then stated, "But I'm pas[t] that now which is why there's no further threat of any harassment. I assure the [c]ourt, I would never bother." He denied taking any of plaintiff's jewelry. Defendant testified he returned the modem to Xfinity and

9

cancelled his contract because he did not want to pay for plaintiff's Wi-Fi. Defendant eventually also terminated the lease on the apartment.

Following the completion of testimony, the trial court issued an oral decision finding defendant had committed two predicate acts—harassment and assault. The court found plaintiff was the more credible witness.

The court concluded the struggle over the phone was "a reckless assault that resulted from a situation of . . . [defendant's] creation." The court stated that during the altercation, plaintiff was pinned to the floor, injured, and suffered some pain.

The court also found that on September 4 defendant went to plaintiff's apartment with the intention of taking her phone. The trial judge stated,

> [Defendant] was there to check up on her, to find out what she was doing over the weekend. He was there to make it clear that if she was not going to have communication with him and stay in contact with him, he was going to enforce his side of the bargain as he understood the bargain to be. And that was that she was going to have to surrender the computer, . . . the telephone, and I guess the next step would have been an eviction from the—from the apartment.

He found that defendant took plaintiff's computer from her apartment when she was away.

A-0364-22

In referring to the two letters written by defendant, the trial judge found there was "ample material" in the letters evidencing defendant's "intent to annoy or alarm . . . plaintiff."  And that satisfied the predicate act of harassment.  The trial judge found defendant's conduct was "an attempt to exercise power and/or control in a relationship."  He stated "the letters are replete with control" and that the second letter was left as a reminder to plaintiff in case "she's forgotten who [is] in charge here."  The trial judge stated there was no evidence to support defendant's "assurances that this will never happen again."  The court concluded it was "inescapable that future acts of domestic violence are a threat if there's no restraining order."  Therefore, the court entered an FRO against defendant and dismissed the TRO against plaintiff.

On October 13, 2022, the trial judge submitted a letter under Rule 2:5-1(d) as amplification of the September 26, 2022 oral decision.  The letter advises that the court considered evidence from both trials on the parties' TROs in making its findings of facts and determining the necessity of an FRO.

On appeal, defendant contends the court erred in finding he committed two predicate acts of domestic violence requiring the issuance of an FRO.

"In [our] review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's

11

findings of fact and the legal conclusions based upon those findings." J.D. v. A.M.W., 475 N.J. Super. 306, 312 (App. Div. 2023) (quoting N.T.B v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)).

"We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

However, we do not defer to the trial judge's legal conclusions "if . . . based upon a misunderstanding of . . . applicable legal principles." T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting N.T.B., 442 N.J. Super. at 215). A judge's legal conclusions are reviewed de novo. Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019).

The entry of an FRO under the PDVA requires the trial court to make certain findings pursuant to a two-step analysis delineated in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)). Harassment and assault

12

are among the predicate acts included in N.J.S.A. 2C:25-19(a). See N.J.S.A. 2C:25-19(a)(2), (13). Second, the judge must determine "whether a restraining order is necessary . . . to protect the" plaintiff from immediate harm or further acts of violence. Silver, 387 N.J. Super. at 127.

A person commits harassment "if, with purpose to harass another," he or she: (a) "[m]akes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;" (b) "[s]ubjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or" (c) "[e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(a) to (c).

A person commits assault "if the person: (1) [a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or (2) [n]egligently causes bodily injury to another with a deadly weapon; or (3) [a]ttempts by physical menace to put another in fear of imminent serious bodily injury." N.J.S.A. 2C:12-1(a)(1) to (3).

Applying these standards to the facts elicited at the trial, we are satisfied the issuance of the FRO is supported by substantial credible evidence in the

13

record.  Plaintiff's testimony regarding the events in September 2022 supported the judge's finding of the predicate acts of assault and harassment.  The judge's credibility findings—adopting plaintiff's narrative of the events over that of defendant's—are entitled to our deference on appeal.

Once the judge determined a predicate act was committed, he considered whether a restraining order was necessary.  The trial judge found a FRO was required because the evidence demonstrated defendant's refusal to accept the relationship was over, his threats to take away plaintiff's home, phone, and computer if the relationship ended, his attacks on her personal character and life choices and his continuing controlling behavior.  We discern no reason to disturb the court's decision to issue a FRO.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14

A-0364-22